## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KATHLEEN PHELAN, individually and all others similarly situated, | ) ) ) |
| Plaintiff, | ) Case No. _____ |
| v. | ) ) ) |
| INTERNAL MEDICINE OF MILFORD, P.C. | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Kathleen Phelan ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through the undersigned counsel, brings this Class Action Complaint against Defendant, Internal Medicine of Milford, P.C. ("Defendant" or "IMMCT"), alleging the following based upon information and belief and the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge:

## I. INTRODUCTION

1.     Plaintiff brings this class action lawsuit on behalf of herself and all persons who entrusted Defendant with sensitive Personally Identifiable Information[1] ("PII") and Protected Health Information[2] ("PHI") (collectively, "Private Information") and who were impacted in a

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R.

data breach that occurred on or about November 5, 2025, but which Defendant only was discovered in February 2026.

    2.    Defendant is a medical provider located in Milford, Connecticut which purports to "[p]rovid[e] extensive clinical care solutions to all of the individuals and families who need our services in Connecticut."[3]

    3.    As a condition of receiving medical treatment from IMMCT, its patients were required to provide Defendant with their sensitive Private Information, including their names, dates of birth, Social Security Numbers, contact information, medical and health insurance information, medical history, driver's license and other information.[4]

    4.    On or about February 7, 2026, it was discovered that IMMCT's systems had been infiltrated by cybercriminals, believed to be Insomnia, on or about November 5, 2025, in a ransomware cyberattack, resulting in the Private Information of Defendant's patients—Plaintiff and the proposed Class Members—being unauthorizedly disclosed ("the Data Breach").[5,6]

---

§ 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't for Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Defendant is clearly a "covered entity" and some of the data compromised in the Data Breach that this action arises out of is "protected health information," subject to HIPAA.

[3] Internal Medicine of Milford, P.C., avail. at. https://immct.com/ (last visited Feb. 12, 2026).

[4] *See* Internal Medicine of Milford, P.C., *Patient Information* form, avail. at https://immct.com/wp-content/themes/internalmedicine/PDF/Patient_Information_Document_2019_new.pdf

[5] *See* DeXpose, *Insomnia Strikes Internal Medicine of Milford in USA Ransomware Attack*, Feb. 8, 2026 avail. at https://www.dexpose.io/insomnia-strikes-internal-medicine-of-milford-in-usa-ransomware-attack/ (last visited Feb. 12, 2026).

[6] HookPhish, *Ransomware Group insomnia Hits: Internal Medicine of Milford*, Feb. 8, 2026, avail. at https://www.hookphish.com/blog/ransomware-group-insomnia-hits-internal-medicine-of-milford/ (last visited Feb. 12, 2026).

5.     In the Data Breach, Defendant lost control over that data when cybercriminals infiltrated and Defendant insufficiently protected computer systems in the Data Breach, resulting in cybercriminals having unfettered access and, upon information and belief, the exfiltration of Plaintiff's and Class Members' Private information.

6.     The Data Breach was the direct result of Defendant's failures to adequately protect and secure its patients' Private Information in accordance with industry standards

7.     Even as Defendant discovered the Data Breach occurred in November 2025, and was publicly announced by the cybercriminals nearly a week ago, IMMCT has yet to publicly acknowledge the occurrence of the Data Breach nor has Defendant notified its affected patients of the unauthorized disclosure of their Private Information.

8.     Accordingly, it is unknown how long cybercriminals have had access to Plaintiff's and the Class Members' Private Information stored in Defendants information systems, whether they still have access to this sensitive data, or whether IMMCT has now secured its systems.

9.     Given that the hackers were able to infiltrate Defendant's information systems for an extended period of time and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—it is likely that Defendant failed to implement reasonable industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralized alerting and logging.

10.     Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply

with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

11.     In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff and Class Members' Private Information.

12.     Given the Defendant's failure in even the most basic requirements of cybersecurity, it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Private Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

13.     Such a failure is beyond ordinary negligence that the Defendant disregard of Plaintiff's and Class Members rights was intentional, willful, or reckless when Defendant failed take adequate and reasonable measures to ensure Defendant data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

14.     Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that their failure to implement reasonable cybersecurity standards would lead to Plaintiff's and Class Member's

harms.

15.     As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact and damages, including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information and misuse of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

16.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

## II. PARTIES

17.     Plaintiff Kathleen Phelan ("Plaintiff") is and was, at all times material hereto, a resident and citizen of the State of Connecticut, with a primary residence in Milford, Connecticut, where she intends to remain. Plaintiff is a current patient of Defendant who entrusted her Private Information to IMMCT as a condition of receiving medical treatment.

18.     Defendant Internal Medicine of Milford, P.C. ("Defendant" or "IMMCT") is a

professional corporation organized and existing under the laws of the State of Connecticut with a principal place of business at 40 Commerce Park, Suite 1, Milford Connecticut 06460.

19.     Defendant's Registered Agent for service of process is Todd Tracy, 40 Commerce Park, Suite 1, Milford Connecticut 06460.

## III.   JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class are citizens of a state different from Defendant.

21.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District.

22.     Venue is proper under 18 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## IV.  FACTUAL ALLEGATIONS

### A.  Defendant IMMCT

23.     Defendant is a medical provider located in Milford, Connecticut, with a "mission is to provide the highest standard of care to our patients and the communities [it] serve[s]…"[7]

24.     IMMCT offers a range of medical services, including acute and preventive care, chronic disease management, pulmonology care, laboratory services, and in-office testing.[8]

25.     As a part of their businesses Defendant collects and maintain the Private

---

[7] https://immct.com/ (last visited Feb. 12, 2026).
[8] https://immct.com/internal-medicine-services (last visited Feb. 12, 2026).

Information of thousands, if not hundreds of thousands, current and former patients, including, by way of example their names, addresses, dates of birth, telephone numbers, email addresses, employer information, insurance information, and other personal data.[9]

26.     Plaintiff and Class Members are current and former patients of Defendant who were required to entrust their Private Information to IMMCT as a condition of receiving medical treatment.

27.     In collecting and maintaining the Private Information, Defendant agreed it would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

28.     Further, Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

29.     Defendant maintains a privacy policy in which IMMCT promises to only disclose Private Information for specific purposes, and noting its responsibilities with respect to PHI, stating:

- We are required by law to maintain the privacy and security of your protected health information.
- We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.
- We must follow the duties and privacy practices described in this notice and give you a copy of it.
- We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind.[10]

---

[9]*See Patient Information* form, avail. at https://immct.com/wp-content/themes/internalmedicine/PDF/Patient_Information_Document_2019_new.pdf

[10]     Privacy Policy Notice, avail. at https://immct.com/wp-content/themes/internalmedicine/PDF/PrivacyPolicy2.pdf

30.     None of these purposes include the Data Breach that Defendant permitted to occur by virtue of its inadequate security policies.

31.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, and to make only authorized disclosures of this information.

32.     As a result of collecting and storing the Private Information of Plaintiff and Class Members for their own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties, in accordance with industry standards.

33.     On information and belief, Defendant has not implemented reasonably cybersecurity safeguards or policies to protect Plaintiff's and Class Members' Private Information or supervised its providers and employees to prevent, detect, and stop breaches of their network or systems. As a result, Defendant leaves significant vulnerabilities in their systems for cybercriminals to exploit and gain access to Plaintiff's and Class Members' Private Information.

**B.  The Data Breach**

34.     Sometime on or about February 7, 2026, Defendant discovered that its information systems were hacked and infiltrated by cybercriminals in the Data Breach during a ransomware attack, in which the cybercriminals exfiltrated Plaintiff's and the Class Members' Private Information.

35.     Indeed, on February 7, 2026, the cybercriminal group, "Insomnia," took responsibility for the Data Breach and "threatened to release sensitive patient data unless

immediate contact is made for negotiation."[11]

36.     On information and belief, the Data Breach may have occurred as early as November 5, 2025 according to Ransomware.live:



[12]

37.     Despite this, Defendant has yet to disclose the occurrence of the Data Breach to the public, or to its affected patients, preventing them from taking necessary measures to protect their Private Information.

38.     Defendant lost control over that data when cybercriminals infiltrated and Defendant insufficiently protected computer systems in the Data Breach, resulting in cybercriminals having unfettered access and, upon information and belief, the exfiltration of Plaintiff's and Class Members' Private information.

39.     Upon information and belief, the cybercriminals were able to infiltrate Defendant's information systems for an extended period of time from November 5, 2025 to at least February 7, 2026. Indeed, it is possible that the Data Breach continues at this date.

40.     Due to Defendant's failure to provide any information concerning the Data Breach,

---

[11] *See* DeXpose, *Insomnia Strikes Internal Medicine of Milford in USA Ransomware Attack*, Feb. 8, 2026 avail. at https://www.dexpose.io/insomnia-strikes-internal-medicine-of-milford-in-usa-ransomware-attack/

[12] *See* Ransomware.live, https://www.ransomware.live/group/insomnia

it is unknown precisely which Private Information of Plaintiff and the Class Members has been exfiltrated and exposed.

41.    On information and belief, the Private Information of Plaintiff and the Class Members that was unauthorizedly exposed in the Data Breach includes their names, addresses, dates of birth, telephone numbers, email addresses, employer information, insurance information, and other personal data.

42.    Defendant's prolonged investigation and response time, in addition to the *modus operandi* to use a "double-extortion model,[13] strongly suggests either (i) Defendant only discovered the Data Breach upon delivery of a ransom note after cybercriminals completed most of their attack, or (ii) Defendant discovered the attack prior to the ransom note, but could not prevent from accessing and exfiltrating Private Information stored on Defendant's network.

43.    Given that the hackers were able to infiltrate Defendant's information systems for an extended period of time and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—it is likely that Defendant failed to implement reasonable industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralized alerting and logging.

44.    In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff and Class Members' Private Information.

45.    Given the Defendant's failure in even the most basic requirements of cybersecurity,

---

[13] *#Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Feb. 4, 2026).

it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Personal Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

46.     To date, Defendant has done nothing to provide Plaintiff and the Class Members with relief for the damage they have suffered because of the Data Breach. Even if Defendant did offer credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' Private Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.[14]

47.     Because of the Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cyber criminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

48.     Defendant owed a duty to protect Plaintiff and Class Members from the harm of the Data Breach.

49.     Defendant owed a duty to protect Plaintiff and Class Members from the harm that insufficient data security and the consequential exposure of Private Information would cause because such harm was foreseeable and reasonably preventable.

50.     Defendant knew of the ubiquity of data breaches in the healthcare industry and that any breach of its network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the tens of thousands individuals whose Private Information was compromised, as well as intrusion into their private and sensitive financial matters.

---

[14] Chi Chi Wu, *Essentials About Credit reporting: Consumer Debt Advice form NCLC*, NAT'L CONSUMER L. CTR. (July 6, 2018), https://library.nclc.org/article/essentials-about-credit-reporting-consumer-debt-advice-nclc (explaining how most negative information stays on your credit report for seven years).

51.    Defendant failed to implement and adequate and reasonable means to meet the industry, FTC, and HIPAA standards, as well as failed to protect its patients.

52.    The Data Breach is the direct result of Defendant's failures to implement basic data security measures over patients' data in its custody and control. Had Defendant implemented reasonable cybersecurity measures—including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—cybercriminals would not have been able to hack into Defendant's network, perform reconnaissance necessary to locate Plaintiff's and Class Members' Private Information, and then exfiltrate that data before being detected.

53.    Defendant's tortious conduct and breach of contractual obligations, as detailed in herein, are evidence by its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until *months* after cybercriminals breached its network and accessed Plaintiff's and Class Members' Private stored therein—meaning Defendant had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

54.    Moreover, upon information and belief, Defendant's tortious conduct and breach of contractual obligations are evidence by the Defendant's failure to recognize the Data Breach until the cybercriminals alerted Defendant's via a ransom demand.

55.    Defendant's negligence in safeguarding Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data, as well as the ubiquitous nature of data breaches.

56.    As a result of the Data Breach, Plaintiff and Class Members now face an increased risk of fraud and identity theft, among many other actual and imminent damages.

57.    Moreover, Plaintiff and Class Members have an interest in ensuring that their

Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches.

58.     Because of the Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cyber criminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

## C.  The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice

59.     Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as verifying eligibility for employment, opening a new bank account or securing access to credit at favorable rates, and accessing benefits.

60.     In light of recent high profile data breaches, Defendant knew or should have known that its electronic records would be targeted by cybercriminal.

61.     In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[15]

62.     In April 2020, ZDNet reported, in an article tilted "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[16]

63.     In September 2020, the United States Cybersecurity and Infrastructure Security

---

[15] 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[16] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion." [17]

64.    Defendant's data security obligations were also particularly important given the substantial increase in Data Breaches in the healthcare industry preceding the date of the breach. Because of the value of its collected and stored data, the medical industry has experienced disproportionately higher numbers of data theft events than other industries.

65.    Indeed, "Comparitech disclosed that in the first nine months of 2025, 293 ransomware attacks were recorded on hospitals, clinics, and other direct care providers. An additional 130 attacks targeted business within the healthcare sector, including pharmaceutical manufactures, medical billing providers, and healthcare tech companies."[18]

66.    The healthcare industry consistently reports as the industry with the highest, or one of the highest, number of data breaches.[19]

67.    Further, "[i]n 2024, the healthcare industry experienced a concerning surge in data breaches, with over 300 million patient records compromised—a 26% increase from 2023."[20]

68.    According to Advent Health University, when an electronic health record "lands in

---

[17] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Feb. 4, 2026).
[18] Anna Riberio, *Healthcare Ransomware Attacks Surge 30% in 2025, as Cybercriminals Shift Focus to Vendors and Service Partners*, COMPARITECH (Oct. 13, 2025), https://industrialcyber.co/reports/healthcare-ransomware-attacks-surge-30-in-2025-as-cybercriminals-shift-focus-to-vendors-and-service-partners/.
[19] IDENTITY THEFT RES. CTR., 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. 25 (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[20] BLUESENSE, BREACH BAROMETER ANNUAL REPORT 2 (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf.

the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[21]

69.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

70.    According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[22]

71.    Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[23]

72.    The HIPAA Journal article goes on to explain that patient records, are "often

---

[21] *5 Important Elements to Establish Data Security in Healthcare*, ADVENT HEALTH UNIV. (May 21, 2020), https://www.ahu.edu/blog/data-security-in-healthcare.
[22] Steve Adler, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA J. (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[23] *Id.*

processed and packaged with other illegally obtained data to create full record sets (known as "Fullz" package) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[24]

73.    Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

74.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2020.[25]

75.    These significant increases in attacks to companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant.

76.    This readily available and accessible information confirms that, prior to the Data breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

77.    Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' Private Information could be accessed, exfiltrated, and published as a result of a cyberattack. Notably, data breaches are prevalent in

---

[24] *Id.*
[25] Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, Sec. Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

78.     Defendant knew or should have known that it should have encrypted its employees' and patients' Private Information to protect against their publication and misuse in the event of a cyberattack.

**D.  Defendant Could Have Prevented the Data Breach**

79.     Data breaches are preventable.[26] Indeed, the American Bar Association published a treatise titled the Data Breach and Encryption Handbook wherein the author explained that:

a.     "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." [27]

b.     "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[28]

c.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[29]

---

[26] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH & ENCRYPTION HANDBOOK (2012).
[27] *Id.* at 17.
[28] *Id.* at 28.
[29] *Id.*

### E.  Defendant Fails to Comply with FTC Guidelines

80.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

81.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30]

82.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

83.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

84.     The FTC further recommends that companies not maintain Private Information

---

[30] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

85.    The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

86.    Defendant failed to properly implement basic data security practices, and their failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

87.    Defendant was at all times fully aware of its obligation to protect the Private Information of employees and patients. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**F.  Defendant Violated HIPAA**

88.    Defendant is a covered business under HIPAA 945 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

89.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[31]

90.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[32]

91.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained.[33]

92.     The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

    a.     Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

    b.     Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

---

[31] HIPAA and HITECH work in tandem to provide guideline and rules for maintaining protected health information, HITECH references and incorporates HIPAA.

[32] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[33] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

c.  Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.  Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.  Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

93.     Simply put, the Data Breach resulted from a combination of insufficiencies demonstrating that Defendant failed to comply with safeguards mandated by HIPAA regulations.

## G. Defendant Failed to Comply with Industry Standards

94.     As shown above, experts studying cyber security routinely identify businesses such as the Defendant as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

95.     To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those

with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[34]

96.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United

---

[34] HOW TO PROTECT YOUR NETWORKS FROM RANSOMWARE 3–4, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document) (last visited Feb. 4, 2026).

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . . .

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it . . . .

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic…..[35]

97.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-facing assets**

- Apply latest security updates

- Use threat and vulnerability management

- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

---

[35] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities

- Hunt for brute force attempts

- Monitor for cleanup of Event Logs

- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall

- Enable tamper protection

- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[36]

98.     Given that Defendant was storing the Private Information of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[36] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

99.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

100.    The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

**H.  The Data Breach Caused Plaintiff and the Class Members Injury and Damages**

101.    Plaintiff and members of the proposed Class Members have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

102.    Data Breaches such as the one experienced by Plaintiff and Class Members are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

103.    As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

104.    Once an individual's Private Information is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more

information. [37]

105.    The ramifications of Defendant's failure to keep Plaintiff's and the Class Members' Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, medical information or other information, such as addresses, without permission, to commit fraud or other crimes.

106.    Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a.    The loss of the opportunity to control how Private Information is used;

b.    Unauthorized use of stolen Private Information;

c.    Dramatic increase in spam telephone calls;

d.    Emotional distress;

e.    The compromise and continuing publication of their Private Information;

f.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and

---

[37] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h.     The diminution in value of their Private Information; and,

i.     The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fail to undertake the appropriate measures to protect the Private Information in its possession.

**I.   The Data Breach Caused Plaintiff and the Class Increased Risk of Identity Theft**

107.   The Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

108.   Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' Private Information falling into the hands of identity thieves.

109.   The unencrypted Private Information of Class Members has already or will end up for sale on the dark web, because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the Private Information for the express purpose of conducting financial fraud and identity theft operations.

110.   The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price

ranging from $40 to $200, and bank details have a price range of $50 to $200.[38] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[39] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[40]

111.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

112.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[41]

113.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

114.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the cybercriminal to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

115.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a

---

[38] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.
[39] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.
[40] *For Sale in the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last visited Feb. 4, 2026).
[41] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

116.    Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access "Fullz packages" of that person to gain access to the full suite of additional Private Information that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

117.    With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

118.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

119.    Further, using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

120.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

121.    Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[42]

122.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[43] A complete identity theft kit that includes health insurance credentials may be

---

[42] *See What to Know About Medical Identity Theft*, FTC (Sept. 2024), http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.
[43] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDENTITY THEFT GUARD SOLS. (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

worth up to $1,000 on the black market, whereas stolen payment card information sells for about

$1.[44]

123.    According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[45]

124.    The "high value of medical records on the dark web has surpassed that of social

security and credit card numbers. These records can sell for up to $1,000 online."[46]

125.    Additionally, Social Security numbers are particularly sensitive pieces of personal

information. As the Consumer Federation of America explains:

*This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your

---

[44] *Managing Cyber Risks in an Interconnected World, Key Findings from the Global State of Information Security Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-security-survey-2015.pdf.

[45] Brian O'Connerr, *Healthcare Data Breach: What to Know About Them and What to Do After One*, EXPERIAN (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/,
https://web.archive.org/web/20250112215107/https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/].

[46] Andrew Steger, *What Happens to Stolen Healthcare Data*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[47] (Emphasis added).

126.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[48]

127.    Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hackers' purposes.

128.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[49] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[50]

---

[47] *Dark Web Monitoring: What You Should Know*, CONSUMER FED'N OF AM. (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[48] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[49] *See Avoid Identity Theft*, SOC. SEC. ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited Feb. 4, 2026).
[50] *Id.*

129.    A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[51]

130.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[52] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[53]

131.    Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[54]

132.    A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[55]

133.    According to the national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows

---

[51] *Identity Theft and Your Social Security Number*, Soc. Sec. Admin. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[52] *See How to Protect Yourself from Social Security Number Identity Theft*, Equifax, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Feb. 4, 2026).
[53] *See* Julia Kagan, *What Is a SSN? What to Know About Social Security Numbers*, Investopedia (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.
[54] Anna Tong, *Hackers Stole Consumers' License Numbers from Geico in Months-Long Breach*, Forbes (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658.
[55] *Id.*

your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

134.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[56] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[57]

135.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[58]

136.    Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the

---

[56] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO MAG. (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.
[57] *Id.*
[58] *How Identity Thieves Took My Wife for a Ride,* NY Times (April 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html.

individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

137.    Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

138.    It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

139.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[59]

140.    Similarly, the Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number

---

[59] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

won't guarantee you a fresh start. This is especially true if your other PII, such as your name and address, remains the same."[60]

141.    Further, the California state government states that "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[61]

142.    The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[62]

143.    Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[63]

---

[60] *Identity Theft and Your Social Security Number*, Pub. No. 05-10064, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[61] *See Your Social Security Number: Controlling the Key to Identity Theft*, CAL. DEPT. JUST. https://oag.ca.gov/idtheft/facts/your-ssn (last visited Feb. 4, 2026).
[62] *What To Do Right Away*, FTC (2024), https://www.identitytheft.gov/Steps.
[63] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identit Crime Victims*, IDENTITY THEFT RES. CTR. (May, 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

144.    What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information are valuable property rights.

145.    Private Information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

146.    Where the most Private Information belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

147.    Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[64]

148.    Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

---

[64] See GAO Report, at p. 29.

149.    Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

150.    Defendant knew or should have known of these harms which would be caused by the Data Breach they permitted to occur and strengthened its data systems accordingly.

**J.  Loss of Time to Mitigate Risk of Identity Theft and Fraud**

151.    Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and Defendant arguing that the individual failed to mitigate damages.

152.    The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

153.    By spending this time, Plaintiff was not manufacturing her own harm, she was taking necessary steps because the Data Breach included her Social Security number and other data.

154.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for

any indication of fraudulent activity, which may take years to detect.

155.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[65]

## K. Diminution in Value of Private Information

156.    PII and PHI are valuable property rights.[66] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

157.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[67]

158.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[68]

159.    Consumers who agree to provide their web browsing history to the Nielsen

---

[65] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T OFFICE, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[66] *See, e.g.*, Randall T. Soma et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[67] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[68] *See e.g.*, https://datacoup.com/ (last visited Feb. 4, 2026).

Corporation can receive up to $50.00 a year.[69]

160.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[70]

161.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

### L. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary

162.    Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

163.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

164.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost

---

[69] *Frequently Asked Questions*, NIELSON COMPUT. & MOBIL PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Feb. 4, 2026).
[70] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### M. Lost Benefit of the Bargain

165.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendant with their Private Information under certain terms, Plaintiff and Class Members understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services and/or employment of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### N. Plaintiff's Experience and Injuries

166.    Plaintiff is a former patient of Defendant for thirty (30) years, approximately. In order to receive treatment as a patient with Defendant, Defendant conditioned treatment upon receipt of Plaintiff's Private Information. As such, Plaintiff provided Defendant with her Private Information, which was then used to facilitate treatment of Plaintiff.

167.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff's Private Information in its system, which Defendant had access to.

168.    Plaintiff has yet to receive a notice letter from Defendant of the Data Breach.

169.    Plaintiff is very careful about sharing her Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's grossly inadequate data security policies.

170.     In order to obtain services from Defendant, Plaintiff was required to provide her Private Information to IMMCT, including among other things, her name, date of birth, Social Security Number, contact information, medical and health insurance information, medical history, driver's license and other information.

171.     As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time, roughly one (1) hour, dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

172.     Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

173.     Upon information and belief, as a result of its inadequate cybersecurity, Defendant exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

174.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has

been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

175.    As a result of the Data Breach and given Defendant's explicit instructions, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

176.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

177.    Plaintiff has a continuing interest in ensuring her Private Information which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

178.    Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

## V.  CLASS ALLEGATIONS

179.    Plaintiff brings this nationwide class action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

180.    The Class that Plaintiff seeks to represent is defined as follows:

**All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party because of the Data Breach (the "Class").**

181.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

182.     Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

183.     **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. On information and belief potentially billions of individuals will soon be notified by Defendant of the Breach. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals or is in the process of doing so (as evidenced by sending them breach notification letters).

184.     **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

   a.     Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

   b.     Whether Defendant had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

   c.     Whether Defendant had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

   d.     Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

   e.     Whether and when Defendant actually learned of the Data Breach;

f.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information been compromised;

g.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.      Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.      Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages because of Defendant's wrongful conduct;

k.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of the Data Breach.

185.    **Typicality:** Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

186.    **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical

of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

187.    **Superiority and Manageability**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

188.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

189.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

190.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

191.     Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

## VI.  CAUSES OF ACTION

### <u>COUNT I</u>
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

192.     Plaintiff repeats and re-alleges the above paragraphs as if fully set forth herein.

193.     Upon information and belief, Plaintiff and Class Members entrusted Defendant with their Private Information as a condition of receiving necessary medical care.

194.     Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

195.     Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

196.     Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information in order to receive medical care.

197.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

198.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

199.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove individuals' Private Information it was no longer required to retain pursuant to regulations.

200.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiff and the Class.

201.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and the Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.      Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and the Class Members' Private Information;

      b.      Failing to adequately monitor the security of their networks and systems;

      c.      Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

      d.      Allowing unauthorized access to Plaintiff's and the Class Members' Private Information;

      e.      Failing to detect in a timely manner that Plaintiff's and the Class Members' Private Information had been compromised;

f.   Failing to remove former patients' Private Information it was no longer required to retain pursuant to regulations,

g.   Failing to timely and adequately notify Plaintiff the Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h.   Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

202.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

203.   Defendant's violation of Section 5 of the FTC Act constitutes negligence.

204.   Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

205.   Defendant's violation of the FTC Act is *prima facie* evidence of negligence.

206.   The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

207.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

208.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

209.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

210.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

211.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

212.    Plaintiff and the Class had no ability to protect their Private Information that was in, and remains in, Defendant's possession.

213.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class because of the Data Breach.

214.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent,

mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

215.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

216.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

217.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury and damages, including but not limited to: (i) invasion of privacy; (ii) theft of Private Information and misuse of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

218.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not

limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

219.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

220.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

221.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

222.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**<u>COUNT II</u>**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

223.    Plaintiff repeats and re-alleges the above paragraphs as if fully set forth herein.

224.    When Plaintiff and Class Members provided their Private Information to Defendant, Plaintiff and Class Members entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members that their Private Information had been breached and compromised.

225. These promises were set forth in Defendant's conduct and representations, as well as in its privacy policy.[71]

226. Defendant required Plaintiff and Class Members to provide and entrust their Private Information as a condition of receiving medical treatment.

227. Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant.

228. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

229. Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect the Private Information of Plaintiff and Class Members and by failing to provide timely and accurate notice to them that their Private Information was compromised in and because of the Data Breach.

230. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**<u>COUNT III</u>**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

231. Plaintiff repeats and re-alleges the above paragraphs as if fully set forth herein.

232. This count is pleaded in the alternative to the breach of implied contract count above (Count II).

---

[71] *Privacy Policy Notice*, avail. at https://immct.com/wp-content/themes/internalmedicine/PDF/PrivacyPolicy2.pdf (last visited Feb. 12, 2026).

233.    Plaintiff and Class Members conferred a monetary benefit to Defendant when they provided their Private Information to Defendant as a condition of receiving medical care.

234.    Defendant knew that Plaintiff and Class Members conferred a monetary benefit to it, and it accepted and retained that benefit. Defendant profited from this monetary benefit, as the transmission of Plaintiff and Class Members Private Information to Defendant from its patients is an integral part of Defendant's business. Without collecting and maintaining Plaintiff' and Class Members' Private Information, Defendant would be unable to have patients and conduct business.

235.    Defendant was supposed to use some of the monetary benefit provided to it by its clients at Plaintiff' and Class Members' expense to secure the Private Information belonging to Plaintiff and Class Members by paying for costs of adequate data management and security.

236.    Defendant should not be permitted to retain any monetary benefit belonging to Plaintiff and Class Members because Defendant failed to implement necessary security measures to protect the Private Information of Plaintiff and Class Members.

237.    Defendant gained access to the Plaintiff' and Class Members' Private Information through inequitable means because Defendant failed to disclose that it used inadequate security measures.

238.    Plaintiff and Class Members were unaware of the inadequate security measures and would not have entrusted their Private Information to Defendant's clients, and thereby Defendant, had they known of the inadequate security measures.

239.    To the extent that this cause of action is pleaded in the alternative to the others, Plaintiff and Class Members have no adequate remedy at law.

240.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy;

(ii) theft of Private Information and misuse of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

241.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

242.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds from the monetary benefit that it unjustly received from them.

## COUNT IV
## DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

243.    Plaintiff repeats and re-alleges the above paragraphs as if fully set forth herein.

244.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

245.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury because of the compromise of her and the proposed Class Members' Private Information and remain at imminent risk that further compromises of their Private Information will occur in future.

246.    Lastly, an actual controversy exists because Defendant has failed to provide Plaintiff and the Class Members notice as to the occurrence of the Data Breach and the exposure and compromise of their Private Information therein.

247.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendant owes a legal duty to secure patients' Private Information and to timely notify consumers of a data breach under the common law, Section 5 of the FTCA; and

    b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure patients' Private Information.

248.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lacks an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and she will be forced to bring multiple lawsuits to rectify the same conduct.

249.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

250.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and other individuals whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

A.    For an order determining that this action is properly brought as a class action and appointing Plaintiff as the representative of the Class and her counsel as Class Counsel;

B.    For an amount in damages in sums to be determined by the Court and/or jury, including actual, compensatory, nominal, and consequential damages;

C.    For an order declaring that Defendant's conduct violates the laws referenced herein;

D.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

E.    For an award of statutory damages or penalties to the extent available;

F.    For pre-judgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of monetary relief; and

H.    Such other and further relief as the Court deems necessary and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 17, 2026                    Respectfully submitted,

*/s/ Oren Faircloth*
Oren Faircloth (CT Bar # 438105)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
(929) 677-5181
ofaircloth@sirillp.com

J. Gerard Stranch, IV*
Grayson Wells*
Andrew E. Mize*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
amize@stranchlaw.com

* *Pro Hac Vice applications forthcoming*

***Counsel for Plaintiff and the Proposed Class***